**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 30, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

GOVERNOR OF THE STATE OF
KANSAS; IOWA TRIBE OF
KANSAS AND NEBRASKA;
KICKAPOO TRIBE OF INDIANS OF
THE KICKAPOO RESERVATION IN
KANSAS; PRAIRIE BAND OF
POTAWATOMI NATION; SAC AND
FOX NATION OF MISSOURI IN
KANSAS AND NEBRASKA,

      Plaintiffs-Appellants,

v.

DIRK KEMPTHORNE, Secretary of
the Interior; AURENE MARTIN,
Acting Assistant Secretary of the
Interior,

      Defendants-Appellees.

No. 06-3213

## **ORDER**

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.

**EBEL**, Circuit Judge.

The appellees petition for rehearing is granted.  The published opinion filed October 24, 2007, is vacated and a revised opinion is attached.


Entered for the Court


Elisabeth A. Shumaker, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 30, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

GOVERNOR OF THE STATE OF
KANSAS; IOWA TRIBE OF
KANSAS AND NEBRASKA;
KICKAPOO TRIBE OF INDIANS OF
THE KICKAPOO RESERVATION IN
KANSAS; PRAIRIE BAND OF
POTAWATOMI NATION; SAC AND
FOX NATION OF MISSOURI IN
KANSAS AND NEBRASKA,

    Plaintiffs-Appellants,

v.

DIRK KEMPTHORNE, Secretary of
the Interior; AURENE MARTIN,
Acting Assistant Secretary of the
Interior,

    Defendants-Appellees.

No. 06-3213

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 03-CV-4140-JAR)**

---

Mark S. Gunnison of Payne & Jones, Chartered, Overland Park, Kansas (Stephen
D. McGiffert, Payne & Jones, Chartered, Overland Park, Kansas; Thomas
Weathers and Meredith D. Drent, Alexander, Berkey, Williams & Weathers LLP,
Berkeley, California; Steven D. Alexander, Assistant Attorney General for the
State of Kansas; Steven O. Phillips, Assistant Attorney General for the State of
Kansas; Amelia C. Holmes, Horton, Kansas, with him on the brief), for Plaintiffs-
Appellants.

Allen M. Brabender, United States Department of Justice, Washington, D.C. (Lisa Jones, United States Department of Justice, Washington, D.C.; Eric F. Melgren, United States Attorney and Jackie A. Rapstine, Assistant United States Attorney, Topeka, Kansas; Sue Ellen Wooldridge, Assistant United States Attorney General, Washington, D.C., with him on the brief), for Defendants-Appellees.

---

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This appeal represents another chapter in the long-running dispute over the Secretary of the Interior's 1996 decision to take a tract of land in downtown Kansas City, Kansas (the "Shriner Tract," or simply the "Tract"), into trust for the benefit of the Wyandotte Tribe of Oklahoma, which intends to operate a casino on the property. The Governor of Kansas, along with three other Indian tribes, attempted to block the trust acquisition by filing suit in federal court, claiming that the Secretary erroneously determined that she was statutorily bound to take the Tract into trust. Sac & Fox Nation v. Babbitt, 92 F. Supp. 2d 1124 (D. Kan. 2000). While that case was pending in the district court, however, the Wyandotte purchased the Tract and the Secretary took it into trust. We eventually remanded the case to the Secretary for reconsideration of her decision to take the Tract into trust, thus officially ending the Sac & Fox Nation case.

On reconsideration after our remand, the Secretary reaffirmed her decision to take the Shriner Tract into trust for the Wyandotte. The Sac & Fox Nation

plaintiffs — now joined by an additional Indian tribe — once again challenged this determination with a new complaint in federal court, thereby initiating the instant case. The district court affirmed the trust status of the Tract, a judgment from which the Plaintiffs now appeal.

While Sac & Fox Nation and the present case present issues related to a single transaction — the trust acquisition of the Shriner Tract — they are distinct in one highly significant respect: at the time the Plaintiffs filed their complaint in the latter case, the Shriner Tract was already held by the United States in trust for the Wyandotte. As a result, the waiver of sovereign immunity provided by Congress in the Quiet Title Act, 28 U.S.C. § 2409a, no longer applied to any action challenging the United States' title to the Tract. Without an applicable waiver of sovereign immunity at the time the complaint was filed, the district court lacked jurisdiction to entertain a challenge to the Secretary's decision. Thus, we are constrained to vacate the district court's judgment and order this case dismissed for lack of jurisdiction.

## BACKGROUND

The history of how the Wyandotte used congressionally designated funds to purchase the Shriner Tract is long and complex, and our previous opinions have described this history in detail. See Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1249-51 (10th Cir. 2006); Sac & Fox Nation v. Norton, 240 F.3d 1250, 1253-57 (10th Cir. 2001), cert. denied, 534 U.S. 1078, 122 S.Ct. 807, 151 L.Ed.2d

693 (2002). We therefore here provide only a brief factual summary before narrowing our focus to the procedural history necessary to our resolution of this appeal.

## A. Factual background

Over the last two hundred years, the Wyandotte ceded much of its traditional territory to the United States. Sac & Fox Nation, 240 F.3d at 1253-55. In 1984, Congress enacted legislation providing for payments to the Wyandotte as compensation for certain of these land transfers. Id. at 1255. Public Law 98-602, 98 Stat. 3149 (1984) ("P.L. 98-602") expressly provides for distribution of these allocated funds among members of the Wyandotte tribe, requiring that eighty percent of the allocated funds be distributed to tribal members as per capita payments. P.L. 98-602, § 105(a). The remaining twenty percent is required to be "used and distributed in accordance with the following general plan" laid out in § 105(b):

> (b)(1) A sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe.
> (2) The amount of such funds in excess of $100,000 shall be held in trust by the Tribal Business Committee of such Tribe for the benefit of such tribe.
> (3) Any interest or investment income accruing on the funds described in paragraph (2) may be used by the Tribal Business Committee of such Tribe for any of the following purposes:
> > (A) Education of the members of such Tribe (including grants-in-aid or scholarships).
> > (B) Medical or health needs of the members of such Tribe (including prosthetics).

- 4 -

> (C) Economic development for the benefit of such Tribe.
> (D) Land purchases for the use and benefit of such Tribe.
> (E) Investments for the benefit of such Tribe.
> (F) Tribal cemetery maintenance.
> (G) Tribal building maintenance.
> (H) Tribal administration.

Pub.L. 98-602, § 105(b). In addition, § 105(c) requires the Secretary to enforce the statute but does not require her approval for the Wyandotte's selection of property to be placed in trust or its management of the excess funds. Id. at § 105(c).

The Wyandotte Tribe's attempts to utilize the funds allocated in § 105(b)(1) form the factual basis for this case. Although the Wyandotte received these funds in 1986, the Tribe made no immediate effort to acquire trust property pursuant to § 105(b)(1); instead, the funds were invested and eventually commingled with other tribal monies in investment accounts. In April 1995, however, the Wyandotte authorized the use of "a portion of the PL 602 set aside funds" for the purchase of property in downtown Kansas City, Kansas, with the intention that this property would be held in trust by the United States and would be used for gaming purposes by the tribe. Pursuant to this plan, in June 1995, Nations Realty — a company contracted by the Wyandotte to develop the tribe's gaming facilities — entered into a contract to purchase the Shriner Tract for $325,000. In anticipation of the purchase, the Wyandotte also filed a "Fee-to-Trust Land

- 5 -

Acquisition Application" with the Department of the Interior in January 1996, thus initiating the Secretary's review process prior to taking the Tract into trust.

This process hit a snag when a Department of Interior appraisal in February 1996 concluded that the Shriner Tract had a market value of only $182,000.[1] Subsequently, in late June 1996, Nations Realty entered into a new contract to purchase the Shriner Tract for a revised purchase price of $180,000. At approximately the same time, Nations Realty also entered into a separate non-competition and non-disclosure agreement with the seller of the Shriner Tract, obligating Nations Realty to pay $152,250 in return for the seller's agreement not to operate a gaming facility within one mile of the Shriner Tract. Prior to closing, Nations Realty assigned its interest in the real estate purchase contract to the Wyandotte; there is no evidence, however, that the Wyandotte received any assignment of, or were directly involved in, the non-competition and non-disclosure agreement.

On June 12, 1996, the Secretary published notice of her decision, pursuant to her duty under § 105(b)(1) of P.L. 98-602, to "acquire title in the name of the United States in trust for the Wyandotte Tribe of Oklahoma for [the Shriner

---

[1]Although § 105(b)(1) does not appear to require that property taken into trust under that section be purchased at market value, the Wyandotte Tribe's authorization specified that the Shriner Tract would be purchased "with a portion of the PL 602 set aside funds at a price less than the appraised fair market value."

Tract] no sooner than 30 days after the date of this notice." 61 Fed. Reg. 29,757 (June 12, 1996).

### B. The <u>Sac & Fox Nation</u> case

On July 12, 1996, exactly thirty days after the Secretary published notice of her decision, the Governor of Kansas and three Indian tribes — the Sac and Fox Nation of Missouri, the Iowa Tribe of Kansas and Nebraska, and the Prairie Band of Potawatomi Indians — filed suit in the United States District Court for the District of Kansas challenging the Secretary's decision to take the Shriner Tract into trust for the Wyandotte. The suit claimed that § 105(b)(1) created no mandatory duty for the Secretary to place the Shriner Tract in trust, and that the Secretary had failed to determine whether the Wyandotte had actually used § 105(b)(1) funds to purchase the Tract in any case.[2] <u>Sac & Fox Nation</u>, 240 F.3d at 1260.

In order to prevent the Secretary from taking the Shriner Tract into trust prior to resolution of these claims, the <u>Sac & Fox Nation</u> plaintiffs requested, and the district court granted, a temporary restraining order ("TRO") forbidding the

---

[2]The <u>Sac & Fox Nation</u> complaint also stated two claims that are not relevant to this appeal: whether National Environmental Policy Act ("NEPA") and National Historical Preservation Act ("NHPA") analyses were necessary prior to acquisition of the Shriner Tract, and whether a cemetery abutting the Shriner Tract was a "reservation" for purposes of the Indian Gaming Reform Act ("IGRA"). <u>Sac & Fox Nation</u>, 240 F.3d at 1260. On appeal, this court held that the Secretary correctly decided that NEPA and NHMA analyses were not necessary, but that the Secretary erred in determining the cemetery to be a "reservation" under IGRA. <u>Id.</u> at 1263, 1267.

Secretary from consummating the trust acquisition. Id. at 1257. The Wyandotte, however, immediately filed an interlocutory appeal with this court, arguing that the real estate contract for the purchase of the Shriner Tract was due to expire and, if the TRO was not dissolved, the opportunity for the Tract to be placed in trust would be lost. Id. "In order to preserve the status quo," we granted the Wyandotte's request and dissolved the TRO

> subject to the conditions which constitute the law of this case, that the respective rights of the parties to obtain judicial review of all issues which have been raised in the complaint below shall be preserved, including standing of all parties, jurisdiction, compliance by the Secretary with all requirements of law, and the ultimate question of whether gaming shall be permitted on the subject land.

Id. (quotations omitted).

With the TRO dissolved, the Wyandotte proceeded with their purchase of the Tract on July 16, 1996, and the Secretary took the Tract into trust for the benefit of the tribe. Id. The district court denied the plaintiffs' subsequent motions challenging the trust acquisition, and eventually dismissed the case on procedural grounds. Id.

On appeal from this judgment, we reversed the district court's procedural dismissal. Reaching the merits of the plaintiffs' claims, we agreed with the Secretary that § 105(b)(1) created a nondiscretionary duty to take any land purchased with the funds designated in that section into trust for the Wyandotte. Id. at 1262. However, we found that the Secretary's factual determination that

- 8 -

the Wyandotte used only § 105(b)(1) funds for the Shriner Tract purchase lacked

sufficient record support  Id. at 1263-64.  We therefore remanded the case to the

district court, with instructions to remand to the Secretary "for further

consideration of the question of whether [§ 105(b)(1)] funds were used for the

acquisition of the Shriner Tract."  Id. at 1268.

The district court issued a judgment remanding the case to the Secretary on

August 23, 2001.  Importantly, the district court clarified in a later order that the

Sac & Fox Nation case was officially closed after the remand, thus requiring any

challenges to the Secretary's decisions on remand to be brought in a "new and

separate action":

> Consistent with the mandate of the Tenth Circuit, this court entered a
> final judgment in these [Sac & Fox Nation] cases on August 23, 2001.
> As directed by the Tenth Circuit, the judgment in part remanded these
> cases to the Secretary of the Interior for further consideration of the
> question of whether Pub.L. 98-602 funds were used for the acquisition
> of a tract of land called the "Shriner Tract."  The court did not maintain
> jurisdiction over these cases after the judgment and order of remand.
> The court believes any appeal of the Secretary's determination
> following the remand must be considered a new and separate action,
> which the instant motion indicates has been filed.
>
> Therefore, the court shall deny plaintiffs' motion [to supplement the
> record and arrange a scheduling conference] because the above-
> captioned cases are closed, and the challenge plaintiffs seek to make
> should be made in a new and separate action.

## C.    Remand to the Secretary and the genesis of the instant case

On remand, the Secretary reconsidered her decision and again concluded

that the Wyandotte had used only § 105(b)(1) funds to purchase the Shriner Tract.

- 9 -

In the published notice of this determination, the Secretary described the history of the Wyandotte's investment of the § 105(b)(1) funds and concluded, based primarily on the analysis of a public accounting firm, that the value of those funds, including appreciation, was $212,170 at the time of the Shriner Tract purchase — more than enough to cover the $180,000 purchase price.[3]  67 Fed. Reg. 10,926 (Mar. 11, 2002).

The former Sac & Fox Nation plaintiffs requested reconsideration of this determination, which the Secretary granted.  In June 2003, after receiving additional briefing from the parties, the Secretary issued a written opinion confirming her prior determination that the Wyandotte had purchased the Shriner Tract using only § 105(b)(1) funds, thereby triggering a nondiscretionary duty to take the Tract into trust.  In particular, the Secretary expressly determined that the language of § 105(b)(1), although ambiguous, should be read so as to permit the use of "interest or investment income" accrued on the original $100,000 allocated in that section, thus allowing the Wyandotte to use up to $212,170 for purchase of the Shriner Tract.  The Secretary also concluded that the purchase price actually paid for the Tract was $180,000 — not $325,000, as alleged by the Sac & Fox

---

[3]The notice actually stated that the value was $121,170 at the time of the Shriner Tract purchase; however, the Secretary subsequently issued a correction, noting that the actual value of the funds was $212,170.  67 Fed. Reg. 30,953 (May 8, 2002).

Nation plaintiffs — and that the Wyandotte's remaining § 105(b)(1) funds were used to satisfy this purchase price.

Plaintiffs tried to file their challenge in the original Sac & Fox Nation case, but were required by the district court to file under a new case number. Accordingly, in July 2003, Plaintiffs — consisting of the former Sac & Fox Nation plaintiffs plus an additional Indian Tribe, the Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas — filed the instant complaint in federal court, specifically challenging the Secretary's March 2002 and June 2003 decisions. The complaint characterized the Secretary's determination that the Shriner Tract was purchased with § 105(b)(1) funds as arbitrary, capricious, and unsupported by substantial evidence, and argued that the Secretary therefore erred by justifying her decision to take the Tract into trust as required by § 105(b)(1). As relief, Plaintiffs requested that the district court enter a declaratory judgment voiding the Secretary's decision and order the Secretary to "revoke the non-discretionary trust status of the Tract and rescind all other trust actions and applications and activities concerning the same."

Plaintiffs also sought to supplement the administrative record with additional evidence they claimed undercut the Secretary's determination that the Wyandotte paid for the Tract with only § 105(b)(1) funds, including a $5,000 check written on an account of Nations Realty's parent company and allegedly used as earnest money for the purchase. The district court granted this request,

once again remanding the case to the Secretary for "the limited purpose of additional investigation or explanation of the supplemental evidence" proffered by Plaintiffs and ordering the Secretary to tender her explanation to the court within 60 days.

In December 2005, pursuant to the district court's order, the Secretary issued another opinion reiterating that only § 105(b)(1) funds and the investment income therefrom were used to purchase the Shriner Tract. The Secretary credited the Wyandotte's assertion that the $5,000 earnest money check was applied to "closing costs and other costs over and above the purchase price" of the Tract, and therefore concluded that "materials presented by Plaintiffs in this second remand refute neither the [public accounting firm's] findings nor the reasoning behind the [Secretary's] 2003 conclusion that Wyandotte acted within the law in funding the Shriner Tract purchase."

On May 9, 2006, the district court affirmed the Secretary's decision to take the Shriner Tract into trust. The court concluded that: (1) because § 105(b)(1) is ambiguous as to whether the Wyandotte could utilize the interest and investment income from that section's allocation of funds towards the purchase of trust property, "the Secretary's interpretation of Section 105(b) is entitled to deference and should be affirmed under Chevron [U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)]"; (2) the Secretary's determination that the $5,000 earnest money check was not applied to the purchase price of the Shriner

Tract was supported by substantial evidence in the administrative record; (3) the Secretary's determination that only § 105(b)(1) funds were used for the purchase, based on a public accounting firm's analysis of the Wyandotte's accounts and a Department of Interior financial analyst's review of that analysis, also found sufficient support in the record; and (4) the Secretary's determination that the actual purchase price of the Shriner Tract was $180,000, not $325,000, was similarly supported by the record. Thus, the court denied Plaintiffs' claims for relief and upheld both the Secretary's legal interpretation of § 105(b)(1) and her substantive findings that only § 105(b)(1) funds were used to purchase the Shriner Tract.

Plaintiffs now appeal the district court's order affirming the Secretary's decision.

## DISCUSSION

On appeal, Plaintiffs dispute all of the district court's conclusions and ask this court to "invalidate the Secretary's decision as arbitrary and capricious, to declare void the trust determination of the Shriner Tract, and alternatively, to remand the case, again, to the Secretary for a full and fair review of the question of whether only funds awarded by P.L. 602 were used to purchase the tract." Plaintiffs' appeal thus raises the same "central question" that has animated their litigation since 1996: whether the Wyandotte used funds designated by §

105(b)(1) to purchase the Shriner Tract, so as to trigger a nondiscretionary duty on the part of the Secretary to take the Tract into trust.

Before we may reach the various facets of this question, however, we are faced with a jurisdictional argument raised by the Secretary for the first time on appeal. The Secretary now argues that sovereign immunity bars the present suit because, at the time the instant complaint was filed, the Shriner Tract was already held in trust by the United States for the Wyandotte, and the Quiet Title Act, 28 U.S.C. § 2409a, "retain[s] the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians." United States v. Mottaz, 476 U.S. 834, 842 (1986).

Normally, of course, "absent extraordinary circumstances, we do not consider arguments raised for the first time on appeal." Hill v. Kan. Gas Serv. Co., 323 F.3d 858, 866 (10th Cir. 2003) (quotation omitted). However, claims of sovereign immunity implicate our jurisdiction and therefore "present[] an exception to the general rule" against considering new arguments on appeal. United States v. Richman, 124 F.3d 1201, 1205 (10th Cir. 1997). Thus, because we have a duty to ascertain whether we have jurisdiction prior to reaching the merits of an appeal, Ellenberg v. N.M. Military Inst., 478 F.3d 1262, 1275 n.11 (10th Cir. 2007), we begin by addressing the Secretary's contention that Plaintiffs' suit is barred by sovereign immunity. Our review of questions of

- 14 -

sovereign immunity is *de novo*.  Shivwits Band of Paiute Indians v. Utah, 428 F.3d 966, 974 (10th Cir. 2005).

### A.    The Quiet Title Act and sovereign immunity generally

"The concept of sovereign immunity means that the United States cannot be sued without its consent."  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks, 960 F.2d 911, 913 (10th Cir. 1992).  Such consent may be found "only when Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text."  United States v. Murdock Mach. & Eng'g Co., 81 F.3d 922, 930 (10th Cir. 1996) (quotation omitted).  In cases concerning the United States' title to real property, the Supreme Court has construed the Quiet Title Act as a waiver of sovereign immunity providing the "exclusive means" for challenging such title.[4]  Mottaz, 476 U.S. at 842 (quoting Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands, 461 U.S. 273, 286 (1983)).

---

[4]The Administrative Procedures Act ("APA") provides a waiver of sovereign immunity that might initially appear applicable in the context of a title dispute involving an administrative agency.  See 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof.  An action . . . seeking relief other than money damages . . . shall not be dismissed . . . on the ground that it is against the United States").  However, the APA's waiver is limited; specifically, it does not "confer [] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  Id.  The Quiet Title Act "retain[s] the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians," Mottaz, 476 U.S. at 842, thus preventing application of the APA waiver.  See Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d 956, 961 (10th Cir. 2004).

- 15 -

The Quiet Title Act states, in relevant part:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.  This section does not apply to trust or restricted Indian lands . . . .

28 U.S.C. § 2409a(a).  Thus, the Act's waiver of sovereign immunity is qualified by an exception for suits challenging title to lands held in trust for Indian tribes: "when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the Government's immunity."  Neighbors for Rational Dev., 379 F.3d at 961 (quoting Mottaz, 476 U.S. at 843).

Several questions are raised by the Secretary's invocation of the Quiet Title Act in the present context.  First, does the Plaintiffs' suit qualify as a quiet title action so as to render a Quiet Title Act analysis applicable?  If so, does the fact that Plaintiffs brought the Sac & Fox Nation case challenging the Shriner Tract's trust status *before* the Secretary had actually taken the Tract into trust affect application of the Act?  Finally, does either this court's order in Sac & Fox Nation purporting to retain Plaintiffs' right to contest the trust acquisition, or the Secretary's continued participation in this litigation up to the present, provide a means to avoid application of the United States' sovereign immunity in this case?

- 16 -

**B.** **Plaintiffs' suit is a "quiet title" action sufficient to invoke the Quiet Title Act**

Two of this court's recent decisions dealing with similar facts require that we treat Plaintiffs' suit as a quiet title action against the United States, thus invoking the Quiet Title Act. In Neighbors for Rational Development, Inc. v. Norton, the Secretary took property owned by the Pueblo Indians of New Mexico into trust, and the Pueblos subsequently made plans to develop the land. 379 F.3d at 959. Neighbors For Rational Development ("Neighbors"), an organization of local citizens, challenged the Secretary's decision as "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because the Secretary (1) failed to comply with [NEPA], and (2) failed to consider the 'regulatory factors for trust acquisitions' in 25 C.F.R. § 151.10." Id. at 960.

Neighbors argued that the Quiet Title Act did not apply because it was not an adverse claimant but a third party, and its suit was not a quiet title action but an APA challenge to the Secretary's decision to place the land in trust. Id. We held, however, that neither of these circumstances were relevant to our application of the Act. Instead, we held that a court faced with a suit challenging the United States' title to land held in trust for an Indian tribe must focus on the *relief* sought by the plaintiffs. Id. at 962.

> In this case, Neighbors asks the court to "enter declaratory judgment that the trust acquisition is null and void." Neighbors also seeks to "permanently enjoin [the Secretary] from converting the [Indian school] property to trust status without fully complying with all federal laws,

- 17 -

> regulations, and Guidelines, including the National Environmental Policy Act." We think these requests fall within the scope of suits the Indian trust land exemption in the Quiet Title Act sought to prevent.

Id. at 961-62 (alterations in original). We based this conclusion on Congress's intent, as expressed in the Quiet Title Act, that third parties be prevented "from interfering with the United States' obligations to the Indians." Id. at 962. "In sum," we concluded, "the Quiet Title Act precludes Neighbors' suit to the extent it seek[s] to nullify the trust acquisition." Id. at 965.

A similar factual situation developed in Shivwitz Band, 428 F.3d at 966. The Shivwits Band of Paiute Indians (the "Shivwits") purchased tracts of land adjacent to a highway south of St. George, Utah, and after the Secretary took these tracts into trust, finalized several leases permitting an advertising company to erect billboards on the trust land. 428 F.3d at 970. When the State of Utah threatened criminal action and the City of St. George issued a stop-work order to the advertising company, the Shivwits filed a federal action seeking declaratory and injunctive relief. Id. The State and City counterclaimed, challenging the statute under which the United States took the land into trust and claiming, inter alia, that "the taking of the land in trust and the approval of the [billboard] lease . . . violated [NEPA] and [DOI] regulations . . . ." Id. Relying on our Neighbors for Rational Development analysis, we held that the Quiet Title Act barred jurisdiction to hear the State and City's arguments "to the extent [they] sought to

challenge the BIA's decision to take the property at issue into trust for the Band." Id. at 976.

The relief sought by Plaintiffs' complaint in this case is functionally identical to that sought by the plaintiffs in Neighbors for Rational Development and Shivwits Band. Plaintiffs seek a determination that the Secretary's decision to place the Shriner Tract in trust "is not within the scope of [her] authority, that the Agency did not comply with applicable procedures, and that its action is otherwise arbitrary, capricious or an abuse of discretion, and that the Agency's Determination must be declared void *ab initio* . . . ." The complaint also seeks an injunction and/or an order of mandamus "requiring the Agency to revoke the non-discretionary trust status of the tract and rescind all other trust actions and applications and activities concerning the same." Similarly, Plaintiffs' opening brief to this court requests that we "invalidate the Secretary's decision as arbitrary and capricious, [and] declare void the trust determination of the Shriner Tract."

As such, Plaintiffs' requested relief plainly presents a direct challenge to the United States' title for the Shriner Tract held in trust for the Wyandotte and therefore "fall[s] within the scope of suits the Indian trust land exemption in the Quiet Title Act sought to prevent." Neighbors for Rational Dev., 379 F.3d at 962. Thus, unless facts exist which distinguish Plaintiffs' suit from those we dismissed in Neighbors for Rational Development and Shivwits Band, the United States'

sovereign immunity prevents the federal courts from exercising jurisdiction over this case.

**C.      The timing of Plaintiffs' complaint in the instant case precludes application of the Quiet Title Act's waiver of sovereign immunity**

Plaintiffs argue that this case is distinguishable from <u>Neighbors for Rational Development</u> and <u>Shivwits Band</u> based on the timing of their challenge to the Secretary's decisions.  In both of those cases, the United States already held title to the land in trust for the tribes at the time the suit challenging the Secretary's decision was filed; here, however, Plaintiffs emphasize that they filed a complaint challenging the Secretary's decision in <u>Sac & Fox Nation</u> *prior* to the Secretary's taking the Shriner Tract into trust.  Thus, they argue, the Quiet Title Act's waiver of sovereign immunity permitted the court to hear their suit at the time it was initiated, and the Secretary's subsequent actions did not divest the court of this jurisdiction.

Although Plaintiffs claim that their challenge to the Secretary's decision was initiated prior to the Secretary taking the Shriner Tract into trust for the Wyandotte, they are referring to the complaint filed on July 12, 1996, which initiated the <u>Sac & Fox Nation</u> case.  As discussed in the facts above, however, <u>Sac & Fox Nation</u> is not the case presently on appeal; it was officially closed by the district court's judgment remanding the case back to the Secretary on August 23, 2001.  The district court in that case expressly disclaimed continuing

jurisdiction, stating in a later order that "any appeal of the Secretary's determination following the remand must be considered a new and separate action."

The instant case is just such a "new and separate action," filed on July 11, 2003 by a slightly different collection of Plaintiffs in the district court under a different case number. Notably, this complaint, by its own terms, challenges only the Secretary's March 2002 determination and June 2003 opinion; it mentions the Sac & Fox Nation case, but only as part of the previous history of litigation surrounding the Huron Cemetery in Kansas City, Kansas. It is thus clear that, despite the existence of certain common issues, Plaintiffs' claims in this case are focused upon the Secretary's legal and factual explanations rendered *after* the judgment and remand in Sac & Fox Nation rendered that case closed.

We therefore look to the status of the Shriner Tract as of July 11, 2003 — the date Plaintiffs filed their complaint in this case — to determine whether the Quiet Title Act's waiver of sovereign immunity applies. As of that date, the Tract was already held in trust by the United States, having been taken into trust at some point prior to our publication of the Sac & Fox Nation opinion in early 2001. See 240 F.3d at 1257. Thus, the Act's exception for Indian trust lands "retain[ed] the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians." Mottaz, 476 U.S. at 842.

- 21 -

As a result, we conclude that Plaintiffs have not demonstrated that a waiver of the United States' sovereign immunity applied at the time they filed the instant suit.[5]

**D.     Neither a court nor the Secretary can preserve the rights of the parties to obtain judicial review of the trust acquisition in the absence of a valid waiver by Congress**

Plaintiffs argue that, even if the Quiet Title Act's waiver does not apply in this case, we should honor our order, issued in 1996 during an interlocutory appeal in the Sac & Fox Nation case, in which we ordered that "the respective rights of the parties to obtain judicial review of all issues which have been raised in the complaint below shall be preserved" after dissolution of the TRO. Sac & Fox Nation, 240 F.3d at 1257. In a similar vein, a suggestion was raised at oral argument that the Secretary's continued participation in this lawsuit waived, or estopped her from invoking, the United States' sovereign immunity. Well-settled law, however, establishes that neither courts nor government officials can effectuate such waiver; only Congress holds that power.

As discussed above, the Sac & Fox Nation plaintiffs sought and initially received a TRO preventing the Secretary from taking the Shriner Tract into trust while that case remained pending. Sac & Fox Nation, 240 F.3d at 1257. However, upon interlocutory appeal by the Wyandotte, this court dissolved the

---

[5]For purposes of this case, accordingly, we need not decide whether the United States could divest a court of jurisdiction if it took this land into trust for the Wyandotte Tribe after the complaint was filed and served.

- 22 -

TRO preventing the Secretary from acquiring the Tract in trust.[6]   Id.   In our July

15, 1996 order vacating the TRO, we explained that the order was not intended to

prevent further review of questions related to gaming on the Tract:

> We hear this matter on an emergency basis and wish to preserve, as best
> we can, the rights of all parties.   In order to do so, [We] take into
> specific consideration the statement of the United States Attorney and
> the counsel for the Wyandotte Tribe that acquisition by the Secretary of
> this land in trust will not affect or bar the ultimate resolution of whether
> this land can be used for Class III gaming pursuant to the Indian
> Gaming Regulatory Act ["IGRA"].
>
> . . . . In order to preserve the status quo, we grant the [Wyandotte's]
> emergency application for stay and hold that the temporary restraining
> order below is dissolved, subject to the conditions which constitute the
> law of this case, that the respective rights of the parties to obtain
> judicial review of all issues which have been raised in the complaint
> below shall be preserved, including standing of all parties, jurisdiction,
> compliance by the Secretary with all requirements of law, and the
> ultimate question of whether gaming shall be permitted on the subject
> land.

Wyandotte Nation, 443 F.3d at 1249-50 (alterations in original).

The Secretary argues that the July 15, 1996 order no longer carries any

authority because Sac & Fox Nation, the case in which it was issued, is closed.

---

[6]Our reasoning in this decision is not revealed in the record, which does not contain our order dissolving the TRO but only the references to it in Sac & Fox Nation, 240 F.3d at 1257, and in Wyandotte Nation, 443 F.3d at 1249-50. According to these cases, our dissolution of the TRO resulted from concerns that either the sales contract or the Secretary's ability to take the Tract into trust would expire on July 15, 1996, and therefore if the TRO remained in effect the purchase of the Tract would never come to pass.  This worry was apparently unfounded; Plaintiffs in this case attached to their reply brief a Notice of Supplemental Information filed by the Wyandotte's attorneys the day after the TRO was dissolved, explaining that the Wyandotte had actually negotiated an extension of some kind during the oral arguments on July 15, 1996.

We need not address whether the order remains applicable, however, because in the absence of an express statutory waiver of sovereign immunity, this court lacks authority to authorize a suit against the United States.

"[O]nly Congress, not the courts, can waive the sovereign immunity of the United States.  Therefore, in the absence of clear congressional consent, then, there is no jurisdiction to entertain suits against the United States."  Merrill Lynch, Pierce, Fenner & Smith, Inc., 960 F.2d at 913 (quotation, alterations, citations omitted); see also Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704 (1949) ("[I]t is not for this Court to examine the necessity [of sovereign immunity] in each case.  That is a function of the Congress."). Congressional consent must come in the form of a statutory authorization:

> In order for a claim against the United States to be heard, first there must be, because sovereign immunity requires it, consent to be sued; and because, with the exception of the Supreme Court, the subject matter jurisdiction of federal courts is defined by statute, there must be, second, Congressional provision of a court with the authority to hear the claim and grant relief.

Franklin Sav. Corp. v. United States, 385 F.3d 1279, 1289 (10th Cir. 2004); see also Kelley v. United States, 69 F.3d 1503, 1507 (10th Cir. 1995) ("[A] waiver of sovereign immunity . . . may not be extended beyond the explicit language of the statute.").

Nor can the actions of the Secretary, or any government official or attorney, act as a waiver or abandonment of the United States' sovereign

immunity. "Because waiver must be unequivocally expressed by Congress, officers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court. The federal government's appearance in court through its officers and agents, therefore, does not waive the government's sovereign immunity." Murdock Mach. & Eng'g Co., 81 F.3d at 931 (quotations, citations omitted); accord Richman, 124 F.3d at 1205 ("[N]either the government's attorneys nor any other officer of the United States may waive the United States' sovereign immunity.").

As a result of the strict jurisdictional nature of sovereign immunity, our waiver analysis is necessarily constrained to consideration of whether the Quiet Title Act itself waived the United States' sovereign immunity. Having already answered this question in the negative, the previous orders of this court and the conduct of the Secretary during litigation are simply irrelevant; without a valid congressional waiver, neither the district court nor this court possess jurisdiction to hear this case. See United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that . . . the existence of consent is a prerequisite for jurisdiction."); Murdock Mach. & Eng'g Co., 81 F.3d at 931 ("[I]n the absence of governmental consent, the courts *lack jurisdiction* to restrain the government from acting, or to compel it to act." (quotation omitted, emphasis in original)). Although this result may seem inequitable in light of the Secretary's failure to raise this issue earlier and our prior attempt to preserve judicial review through our order in Sac & Fox

Nation, "this [c]ourt has no authority to create equitable exceptions to jurisdictional requirements." Bowles v. Russell, 127 S.Ct. 2360, 2366 (2007); see also United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547 (10th Cir. 2001) ("Any waiver [of sovereign immunity] must be construed strictly in favor of the sovereign and not enlarged beyond what its language requires." (alteration, quotation omitted)).

**CONCLUSION**

Although this case follows Sac & Fox Nation in addressing the Secretary's acquisition of the Shriner Tract in trust for the Wyandotte tribe, it is a procedurally separate case. As such, because the relief requested by Plaintiffs' suit effectively renders it a quiet title action against the United States, we look to the Quiet Title Act to determine whether, at the time of the instant complaint, Congress had waived the United States' sovereign immunity. Because the United States had already taken the Tract into trust by the time Plaintiffs' complaint in this case was filed, and the Quiet Title Act expressly excepts land held in trust for Indian tribes from its waiver of sovereign immunity, we conclude that the district court lacked jurisdiction to decide the case below, and we lack jurisdiction to address the merits of this appeal. We therefore DISMISS this appeal and remand to the district court with instructions to VACATE its judgment and DISMISS the case, without prejudice, for lack of jurisdiction.

06-3213, Governor of the State of Kansas, et al. v. Kempthorne

**BRISCOE**, Circuit Judge, concurring, joined by **HARTZ**, Circuit Judge:


I agree that this case is, as indicated by the majority, "procedurally separate" from the Sac & Fox Nation case and that, for reasons of sovereign immunity, the district court lacked jurisdiction to hear it. I therefore concur in the judgment. I write separately, however, to outline what I believe are extraordinary circumstances that appear to justify vacatur of the final judgment entered by the district court in the Sac & Fox Nation case and the authorization of further proceedings in that case.

There is simply no doubt that this case is, in substance, a continuation of the Sac & Fox Nation case. Except for the appearance of an additional plaintiff, the parties in this case are the same as in the Sac & Fox Nation case, and the plaintiffs in the instant case seek to challenge determinations made by the Secretary pursuant to additional administrative proceedings that we directed to be conducted in our 2001 decision in the Sac & Fox Nation case. See Sac & Fox Nation v. Norton, 240 F.3d 1250, 1268 (10th Cir. 2001) (remanding "to the Secretary for further consideration of the question of whether Pub.L. 98-602 funds were used for the acquisition of the Shriner Tract."). Indeed, the plaintiffs in this case, following the conclusion of the additional administrative proceedings we directed, attempted to continue the Sac & Fox Nation case by filing with the district court a motion to supplement the administrative record (to include the

record of the additional administrative proceedings) and for a scheduling conference.

At the time plaintiffs filed that motion, the district court had already, and erroneously (since the parties' dispute was far from settled), entered final judgment in the Sac & Fox Nation case. Cf. Trout Unlimited v. U.S. Dep't of Agric., 441 F.3d 1214, 1218 (10th Cir. 2006) (noting that a remand by a district court to an administrative agency for further proceedings is ordinarily not considered a final decision); Caesar v. West, 195 F.3d 1373, 1374 (Fed. Cir. 1999) ("Remands to administrative agencies, because they mark a continuation of the case, are not generally considered final for jurisdictional purposes."). Presumably in light of its having entered final judgment, the district court denied plaintiffs' motion and directed them to proceed with their challenges to the Secretary's decision by filing a "new and separate action." Not surprisingly, plaintiffs, armed with our July 1996 order allegedly "preserv[ing] the status quo" and protecting their rights to "obtain judicial review" of the Secretary's decision to take the land at issue into trust, proceeded as directed by the district court and filed a new and separate action. In turn, the Secretary, consistent with the language of this court's July 1996 order, proceeded to litigate plaintiffs' challenges on the merits for over four years without asserting any sovereign immunity challenge to the plaintiffs' new and separate action. In short, despite plaintiffs having consistently acted in a timely fashion to challenge the

- 2 -

Secretary's determinations, the actions of this court, the district court, and the Secretary have coalesced in the legally correct, but grossly inequitable, result we are now required to reach.

These circumstances, I submit, are sufficiently extraordinary in nature that they appear to warrant vacatur, pursuant to Federal Rule of Civil Procedure 60(b)(6), of the final judgment entered by the district court in the <u>Sac & Fox Nation</u> case. <u>See</u> <u>McGraw v. Barnhart</u>, 450 F.3d 493, 505 (10th Cir. 2006) (noting that Rule 60(b)(6) "should be liberally construed when substantial justice will thus be served") (internal quotation marks omitted). Absent vacatur of that judgment, manifest injustice will likely result: plaintiffs, through no fault of their own, will be prohibited from pursuing to conclusion the serious challenges they have raised regarding the propriety of the Secretary's decision to take the land at issue into trust. At the same time, the public's broad interest in ensuring that the Secretary has fairly and adequately carried out his obligations will be stymied.

06-3213 - *Governor v. Kempthorne*

**HARTZ**, Circuit Judge, concurring:

I join Judge Ebel's opinion. I also join Judge Briscoe's opinion, recognizing that relief under Fed. R. Civ. P. 60(b)(6) will be unavailable if the government is correct that it can divest a court of jurisdiction by taking land into trust for a tribe after a complaint has been filed and served, an issue we have not decided on this appeal.